IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DALE ALTIZER REECE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 7:14-CV-428 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Dale Altizer Reece ("Reece") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner"), finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Specifically, Reece alleges that the Administrative Law Judge's ("ALJ") rejection of certain opinions of Dr. Edwin Cruz was without substantial support and that the ALJ erred by failing to include limitations relating to all of Reece's severe impairments in her questions to the vocational expert ("VE") at the hearing.

This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have fully briefed all issues and the case is now ripe for decision. I have carefully reviewed the administrative record, the legal memoranda, and the applicable law. I conclude that substantial evidence supports the ALJ's decision to reject parts of Dr. Cruz's opinion and that there was no error in the ALJ's questions to the VE. As such, I **RECOMMEND DENYING** Reece's Motion for Summary Judgment

1

(Dkt. No. 13), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 15.

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This court limits its review to determining whether substantial evidence exists to support the Commissioner's conclusion that Reece failed to demonstrate that she was disabled under the Act. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). If such substantial evidence exists, the final decision of the Commissioner must be affirmed. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Reece bears the burden of proving that she is disabled within the meaning of the Act. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent her from engaging in all forms of substantial gainful employment given her age, education, and work experience. See 42 U.S.C. § 423(d)(2).

The Commissioner uses a five-step process to evaluate a disability claim. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5) whether she can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at step five to establish that the claimant maintains the Residual Functioning Capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## STATEMENT OF FACTS

### Social and Vocational History

Reece was born in 1953 (Administrative Record, hereinafter "R." at 40), and is considered a person of advanced age under the Act. 20 C.F.R. § 404.1463(e). Reece is insured for benefits through December 31, 2015 (R. 19); therefore she must show that her disability began before the end of her insurance period, and existed for twelve continuous months to receive DIB. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). Reece graduated high school and attended some community college classes but did not complete a degree. R. 40. She worked for the Virginia Department of Motor Vehicles ("DMV") for 34 years. Id. Reece spent the last ten years of her career working as a manager at

3

the Pulaski, Virginia DMV office until her retirement in June 2010. R. 38–40. Reece reported that during the relevant period, she had the capacity to stand for approximately two hours and sit for approximately two hours at her job. R. 41. Reece also reported that she had to lift office supplies weighing approximately ten pounds, and that she occasionally had to lift boxes of license plates weighing approximately twenty-five pounds. Id. Reece also helped the public and frequently took over the customer service window position when other employees were unavailable. R. 42.

## Claim History

Reece filed for DIB on March 28, 2011, claiming that her disability began on May 21, 2010. R. 64–65. The state agency denied her application at the initial and reconsideration levels of administrative review. R. 63–73; 74–86. On May 1, 2013, ALJ Anne Sprague held a hearing to consider Reece's disability claim. R. 35–62. Reece was represented by an attorney, Gary Hancock, at the hearing, which included testimony from Reece and vocational expert John Newman. R. 35.

On October 18, 2013, the ALJ entered her decision denying Reece's claims. R. 16–29. The ALJ found that Reece suffered from the severe impairments of asthma, cancer in remission, status-post lumpectomy and node dissection, carpal tunnel syndrome, status-post release in November 2010, plantar fasciitis, and problems with a rash. R. 21. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 22. The ALJ further found that Reece retained the residual functional capacity ("RFC") to perform light work, with occasional overhead reaching with her right arm, occasional pushing and pulling with her right arm, and occasional operation of left foot controls. R. 22. The ALJ also found that Reece should avoid concentrated exposure to humidity, vibration,

4

machinery, and heights, and that Reece should limit her exposure to dust, odors, and fumes. Id. The ALJ determined that Reece could return to her past relevant work as a DMV manager, which was equivalent to a retail manager in the DOT. R. 28. Additionally, the ALJ concluded that Reece could work in other jobs such as receptionist, personnel clerk, and order clerk. Id. Thus, the ALJ concluded that she was not disabled. Id. On June 10, 2014, the Appeals Council denied Reece's request for review (R. 1), and this appeal followed.

## ANALYSIS

Reece argues that the ALJ's decision should be overturned for two reasons: (1) The ALJ rejected certain opinions of Dr. Edwin Cruz (an independent medical expert) without substantial evidence, and (2) because the ALJ erred by failing to include all of Reece's limitations related to her severe impairments in the hypothetical questions posed to the vocational expert. I find that there was substantial evidence to support the ALJ's rejection of Dr. Cruz's conclusions and that the ALJ did pose proper hypothetical questions to the vocational expert that accounted for all of Reece's credibly established limitations.

### Independent Medical Expert's Opinion

Reece argues that the ALJ improperly rejected the opinions of Dr. Cruz that Reece could tolerate no exposure to dust, fumes, odors, or other pulmonary irritants in a workplace. Pl.'s Br. Summ. J. 9. I find that substantial evidence supports the ALJ's rejection of Dr. Cruz's more restrictive opinions regarding Reece's ability to tolerate exposure to dust, fumes, and odors.

Reece completed radiation therapy for treatment of breast cancer on May 7, 2008. R. 376. In September of 2008, she began complaining of fatigue and hot flashes due to her anti-cancer medication, Armidex. R. 377. In January of 2010, Reece's medication was changed to Tamoxifen (R. 371), and in July 2010, she reported feeling much better, but noted that she

5

continued to have hot flashes. R. 370. In later doctor visits, Reece reported no issues with fatigue. See, e.g., R. 410, R. 416, R. 431. On August 17, 2011 (R. 439), and April 13, 2012 (R. 440), Reece reported to her oncologist that she was well aside from a rash and some hot flashes.

From 2009 through 2010, Reece saw Luis Matos, M.D., for treatment of her asthma and breathing problems. R. 310–19. On August 30, 2009, Reece reported to Dr. Matos that she had had several sinus infections that were being treated with antibiotics. R. 315. Reece reported that her asthma had been "well controlled" for the four week period before her appointment. On October 7, 2010, Reece again saw Dr. Matos and reported she had shortness of breath, cough, and wheezing and that she continued to suffer from recurrent sinus infections. R. 313. At this visit, Reece rated her asthma as only "somewhat controlled" for the four week period before her visit. Id. On December 2, 2010, Reece visited Dr. Matos again and reported that her asthma was "well controlled" at this point, and that she did not need to use her rescue inhaler. R. 311.

Reece continued her asthma and allergy treatment with John W. Leslie, M.D., in January of 2011. R. 472. Dr. Leslie noted Reece was a nonsmoker who had allergies to trees, grasses, dogs, cats, and dust mites. Id. During this visit, Dr. Leslie noted Reece's lung function was normal with no respiratory distress, no wheezes, and no rales; Reece's airflow was good, but she experienced post-exam coughing. R. 474. At another visit with Dr. Leslie on March 14, 2011, Dr. Leslie noted Reece had a strong perfume odor about her person. R. 483. Dr. Leslie advised Reece not to wear any perfume, and Reece stated that she did not, but that she had used a scented lotion. Id. Again, an examination of her lung function was normal with no wheezing or respiratory distress and normal breathing. Id. On June 23, 2011, Dr. Leslie noted Reece's Peak Expiratory Flow ("PEF")[1] had improved more than 40%. R. 488. On December 29, 2011, Dr.

---

[1] Peak Expiratory Flow, or "PEF" is a test that measures air flowing in and out of the lungs. The PEF measurement shows the amount of air a person breathes in and out and the rate at which air enters and exits the

6

Leslie reported PEFs of 325 and Reece reported that her breathing was much improved. R. 502. By February of 2012, Dr. Leslie noted that Reece was generally averaging PEF ratings of 320–340, and Reece reported she had only used Maxair once in the previous three months. R. 507. By August of 2012, Reece's PEF readings had remained in the 300–350 range. R. 520. Dr. Leslie's impressions of Reece at this point was that she was "stable" and "compliant." R. 521.

On February 2, 2012, Reece presented to Gary Gross, M.D., complaining of a lesion and rash under her breasts that had been present "on and off for several years." R. 459. Dr. Gross prescribed medication. Id. By February 27, 2012, the rash had gotten worse, and Reece had stopped using the prescribed medications. R. 458. On June 27, 2012, Dr. Gross prescribed hydrocortisone and Mycostatin. R. 457. On October 12, 2012, Reece complained to her oncologist that she was still "having a lot of difficulty with a persistent fungal rash below her breasts." R. 442. On October 24, 2012, Reece saw Lakin Price, LPN, about her rash. R. 434–37. Price prescribed Diflucan, told Reece to keep the area dry, and advised her to use Gold Bond powder as needed. R. 436. On November 27, 2012, Reece followed up at the same clinic and saw Deanna Crutchfield, LPN. R. 430–33. At this visit, the rash was clear and no further treatment was prescribed. R. 432–33. On March 1, 2013, Reece advised her oncologists that the rash was much better, that she had experienced a few flare-ups, but had "much less difficulty" since starting the Diflucan prescription. R. 445.

Reece's medical records were reviewed by two state agency physicians. Brian Strain, M.D., evaluated Reece's records on September 8, 2011. R. 63–73. Dr. Strain concluded that Reece did have exertional limitations, but that she could occasionally lift and/or carry twenty pounds; could frequently lift and/or carry ten pounds; could stand and/or walk for six hours of an

---

lungs. *Peak Flow Measurement*, JOHNS HOPKINS MEDICINE, (Dec. 18, 2015, 9:34AM), http://www.hopkinsmedicine.org/healthlibrary/test_procedures/pulmonary/peak_flow_measurement_92,P07755.

7

eight-hour workday; could sit for six hours of an eight-hour workday; and that Reece was limited in her lower extremities. R. 69–70. Dr. Strain also concluded that Reece could occasionally climb stairs, ramps, ladders, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; that she should avoid concentrated exposure to heat, wetness, humidity, vibration, and hazards like machinery and heights;  and that she should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. R. 70–71. Dr. Strain concluded that Reece had some limitations in her ability to perform work related activities, but that these limitations did not prevent her from performing the work she had done in the past. R. 73.

Joseph Duckwall, M.D., completed his review on February 6, 2012 and came to similar conclusions. R. 74–86. Dr. Duckwall noted that "[t]here are not objective findings to support fully the alleged severity of impairments." R. 81. He noted Reece remained independent in her daily activities and that she was able to do housework, prepare meals, drive, shop, and go out alone to visit people and attend church. Id. Reece was also able to take care of her personal needs and manage her medications and money. Id. Dr. Duckwall advised that Reece should avoid concentrated exposure to extreme cold and heat, wetness, humidity, vibration, and hazards such as machinery and heights. R. 83. He also concluded that Reece should avoid even modest exposure to fumes, odors, dust, gases, and poor ventilation. Id.

At the hearing before the ALJ on May 1, 2013, Reece testified that her health had declined since her breast cancer treatment and that she was always exhausted. R. 43. Reece reported that she had asthma prior to having breast cancer, but that she attributed her fatigue primarily to the cancer and the post-cancer treatment. R. 44. She testified she was not able to go on family vacations or play with her grandchildren like she could before she had cancer. Id. Reece stated that she did not do her housework, but that someone else had to do it for her. R. 46.

8

Reece testified that she got hot flashes several times every day, and that her rash was, at times, so bad that she could not wear a bra or a shirt because of the painful itching and burning. R. 48–49. Reece stated she still had problems with shortness of breath, and that her reaction to fragrances and other smells sometimes caused her shortness of breath to worsen. R. 49–50. Reece also reported she had acid reflux, was experiencing lower back pain, and was still receiving allergy injections. R. 51–53.

On July 24, 2013, the Commissioner requested that Edwin Cruz, M.D., review Reece's records and complete interrogatories that were mailed to him. R. 776. Dr. Cruz completed this review on July 26, 2013. R. 798. Dr. Cruz's conclusions were fairly similar to those of Drs. Duckwall and Strain; however, Dr. Cruz did recommend that Reece "never" be exposed to dust, odors, fumes, and other pulmonary irritants. R. 797. In most other respects, Dr. Cruz's recommendations were less restrictive than those of Drs. Duckwall and Strain.

The ALJ rejected Dr. Cruz's conclusion that Reece could "never" be exposed to dust, odors, fumes, and other irritants because this portion of his opinion was inconsistent with the conclusions of the other reviewing physicians. R. 27. Reece argues that the ALJ did not have substantial evidence to support the decision to discount this portion of Dr. Cruz's opinion. I find that there is substantial evidence to support the ALJ's decision not to adopt Dr. Cruz's more restrictive environmental limitations for Reece.

First, none of Reece's treating physicians ever recommended that she completely avoid exposure to dust, odors, fumes, and other irritants. Even her allergy and asthma specialists did not recommend such drastic restrictions. Dr. Leslie advised Reece to avoid perfume or cologne (R. 411), but he never advised that she avoid all exposure to dust and odors. Dr. Matos also did not recommend that Reece avoid any such exposure.

9

Second, both state agency physicians who reviewed Reece's case did not recommend such an extreme restriction. Both Drs. Strain and Duckwall recommended only that Reece "avoid even moderate exposure" to fumes, odors, dusts, gases, and poor ventilation. R. 70–71; R. 83. Neither recommended that Reece should avoid all such exposure.[2]

Finally, Reece's reports of her daily activities during the relevant period show that her symptoms did not require such a restriction. On May 8, 2011, Reece reported that she was able to prepare meals, do laundry, and complete household chores. R. 211. She was also able to shop for groceries, household items, and clothing, and she was able to complete a weekly shopping trip for groceries that lasted up to one hour. R. 214. She also made social visits with family and friends approximately twice per week and was able to attend church and go to a retirement center on a regular basis. R. 215. While Reece did report that she limited her time outside due to her allergies and shortness of breath (R. 214), she had not consistently reported problems with odors or fumes to her doctors. Her only such complaint occurred during the hearing before the ALJ when she reported that she would become short of breath at work when she encountered fragrances, colognes, flowers, or cigarette smokers. R. 49. Reece's reports of her daily activities and abilities show that she does not need to avoid all contact with fumes, odors, and dust. Making trips to a grocery store, a retirement center, or church would expose Reece to all sorts of fragrances and odors from many sources including vehicle traffic, cleaning products, foods, and other people who may use scented personal products or smoke cigarettes. Reece even told her

---

[2] During the hearing, a question arose regarding the nature of the pulmonary irritants Reece could tolerate. Specifically, Reece's counsel argued that dust, chemicals, and fumes were not the same as pulmonary irritants. Social Security Ruling ("SSR") 85-15 addresses nonexertional impairments and generally classifies sensitivities to fumes, dust, and poor ventilation as "environmental restrictions" along with sensitivities to noise, temperature, and vibration. There is no indication in the SSR or other social security regulations that pulmonary irritants of varying types are to be considered differently. The different types of irritants are frequently referred to as a non-exclusive, non-specific list of possible environmental irritants that may affect a person's ability to work. There is no significant legal difference between fumes, dust, odors, gases, or other pulmonary irritants. Reece's doctors frequently referred to these terms in a non-specific way, indicating they also perceived no significant difference between the various pulmonary irritants she may encounter.

10

doctor in November 2012 that she felt "well in general" and was "considering going back to work." R. 750.

Under the substantial evidence standard, the issue before me is not whether the ALJ could or should have given Dr. Cruz's opinions more weight. The issue is whether substantial evidence – more than a scintilla – supports the ALJ's conclusions. Here, I conclude that there was substantial evidence to support the ALJ's decision to discredit Dr. Cruz's recommended limitations. Therefore, the ALJ's decision should not be overturned on this basis.

### Severe Impairments and the Vocational Expert's Hypothetical Questions

Next, Reece argues that the ALJ erred because she did not present the vocational expert with hypothetical questions that included all of Reece's impairments. Reece alleges that the ALJ failed to include any specific reference to the skin conditions that caused Reece acute pain and would likely cause her to miss work. Pl.'s Br. Summ. J. 9. Reece also alleges that the ALJ failed to specifically reference Reece's fatigue that was a side effect of her cancer medication, which would also cause her to miss work. Id. Reece does admit the ALJ included a limitation in her hypothetical questions that would have required Reece to miss two days of work per month. However, it is unclear whether this limitation was a result of the skin condition or the fatigue. Even if we attribute absenteeism to both limitations, Reece argues that the ALJ did not rely upon this limitation or include it in the RFC. Because both the skin issues and the fatigue could lead to increased absenteeism, Reece argues the ALJ compounded her error by failing to include these limitations in the RFC.

In the fifth step of the ALJ's analysis, the ALJ must present hypothetical questions to a vocational expert that "fairly set out all of [the] claimant's impairments." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). However, only those impairments that the ALJ finds credibly

11

established must be included in the questions posed to the vocational expert. Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (noting that hypothetical questions must "adequately" describe a claimant's impairments); McCormick v. Colvin, No. 6:12-CV-01454, 2013 WL 5350620, at *4 (S.D.W. Va. Sept. 23, 2013) (clarifying that an ALJ is not required to submit every impairment alleged by a claimant, but that the ALJ is only required to posit hypothetical scenarios based on "credibly established limitations"); see also Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (holding that "the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations" and that these limitations must be medically substantiated).

There is no requirement that the limitations posed to the VE be specifically linked to a particular impairment. The ALJ is only required to submit hypothetical questions that adequately reflect the claimant's RFC as found by the ALJ and supported by sufficient evidence. Fisher v. Barnhart, 181 F. App'x 359, 364 (4th Cir. 2006).

In this case, substantial evidence supports the ALJ's RFC determination of Reece's physical limitations, and therefore supports the ALJ's choice of hypothetical questions. The ALJ concluded that the severity of Reece's alleged limitations relating to her post-cancer fatigue and her skin condition were not credibly established. R. 25–26. The ALJ did find that Reece suffered from severe impairments that included her skin problems and her post-cancer health issues. R. 21. However, the ALJ also concluded that Reece's statements "concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." R. 25. While Reece did, indeed, experience the symptoms she claimed, the ALJ found that treatment had been "generally successful in controlling those symptoms." R. 26. This conclusion is supported by the record, which establishes that while Reece did have issues with post-cancer fatigue and skin

12

irritation, these conditions were controlled with a course of medication and treatment. Reece's fatigue and rash progressively improved over the course of her visits to her various healthcare providers. Based, in part, on her complaints of fatigue, Reece's post-cancer medication was changed from Armidex to Tamoxifen in January of 2010. R. 371. After this change, Reece reported that she felt much better, but that she still experienced hot flashes. R. 370. By August of 2011, Reece reported that she was well aside from her rash and hot flashes. R.440. The rash had cleared up by the end of November 2012 (R. 432–33), and in the same month, Reece reported to Dr. Fariss that she felt well overall and was considering going back to work. R. 750. "If a symptom can be reasonably controlled by medication or treatment it is not disabling." Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). There is substantial evidence to support the ALJ's conclusion that Reece's symptoms were controlled by medication and treatment and were therefore not disabling.

Because the alleged need to miss two days of work per month was not a credibly established limitation of Reece's impairments, there was no need for the ALJ to factor such a limitation into her RFC or into the hypothetical questions posed to the vocational expert. Even so, the ALJ did pose a hypothetical question to the vocational expert regarding a person similarly situated to Reece who would need to miss two days of work per month. R. 57. The expert responded that this rate of absenteeism would be "unacceptable" and would "preclude any competitive employment." Id. However, the ALJ ultimately concluded that Reece did not actually need to miss two days of work per month, and this conclusion was supported by substantial evidence. Therefore, the ALJ was under no obligation to craft an RFC that would account for such a limitation.

13

Finally, there is nothing internally inconsistent about the ALJ's finding that Reece's skin condition and fatigue were severe impairments and at the same time concluding that Reece's resulting limitations were not as extreme as she claimed. Reece's combination of impairments resulted in significant limitations to her ability to work. The specific limitations found by the ALJ were, however, less restrictive than the limitations claimed by Reece. Because substantial evidence supports the ALJ's conclusions, her decision should be affirmed.

## CONCLUSION

Given the findings set forth above, I recommend that the Commissioner's decision be affirmed, the defendant's motion for summary judgment be **GRANTED**, and Reece's motion for summary judgment be **DENIED**.

The Clerk is directed to transmit the record in this case to Glen E. Conrad, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

[Endorsement on the next page]

Enter: January 25, 2016

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge